OPINION *Page 2 
{¶ 1} Defendant-appellant Richard McCormick appeals his conviction and sentence from the Coshocton County Court of Common Pleas on one count of receiving stolen property. Plaintiff-appellee is the State of Ohio.
 STATEMENT OF THE FACTS AND CASE {¶ 2} On June 26, 2006, the Coshocton County Grand Jury indicted appellant on one count of receiving stolen property in violation of R.C. 2913.51(A), a felony of the fourth degree. At his arraignment on July 5, 2006, appellant entered a plea of not guilty to the charge contained in the indictment.
 {¶ 3} Subsequently, a jury trial commenced on March 6, 2007. The following testimony was adduced at trial.
 {¶ 4} Appellant is Melody Berry's brother. Randy Berry, who at all relevant times was divorced from Melody Berry, [1] owned a Harley Davidson Sportster motorcycle that he stored in one of two garages on his property. In April of 2006, Berry discovered that the motorcycle was missing and contacted the Sheriffs office. Berry provided Deputy Walsh of the Sheriffs Department with the title and identification numbers to the motorcycle. At trial, Berry testified that, at the time the motorcycle came up missing, he had been contemplating selling his motorcycle and had been offered $500.00 for the same. When asked, Berry testified that he had never sold the motorcycle, given it as a gift to anyone or given anyone permission to remove it from his garage. The motorcycle was later found at appellant's home. A photograph of Berry's motorcycle was admitted into evidence at trial as State's Exhibit 1. *Page 3 
 {¶ 5} On cross-examination, Berry testified that he never gave the motorcycle to appellant or to Melody. He further testified that, a day or so after reporting the motorcycle stolen, he heard rumors that the same might be at appellant's home and that he provided such information to the Coshocton County Sheriffs Department.
 {¶ 6} The next witness to testify at trial was Floyd Lewis, who was, as of the time of the trial, incarcerated at Belmont Correctional Camp for robbery. Lewis testified that prior to his robbery conviction, he had been working as a confidential informant between April 13, 2006, and May 11, 2006, for the Sheriffs Office and was making controlled drug buys. Lewis further testified that while acting as a confidential informant, he had contact with appellant, who he had known for approximately 15 years, and went to appellant's home in April of 2006 to borrow a jack to fix Lewis' sister's car. According to Lewis, while the two were talking, appellant mentioned that he had a motorcycle for sale. Lewis testified that appellant "let me know that it was stolen and that there was no title for it and we needed to be real discrete about how we sold it." Transcript Vol. I at 127. Appellant asked Lewis to help him find a buyer for the motorcycle. Lewis testified that he saw the motorcycle at appellant's home and identified the motorcycle in State's Exhibit 1 as the motorcycle.
 {¶ 7} Lewis then contacted Detective Mike Carroll and told him that appellant tried to sell a "hot", or stolen, motorcycle. The detective, according to Lewis, arranged for Lewis to arrange a transaction for the motorcycle. After Lewis called appellant using the detective's cell phone and told appellant that he had found a buyer for the motorcycle, appellant told Lewis that he wanted $400.00 for the motorcycle and that he would give Lewis $50.00 for his services in securing a buyer. The conversation between *Page 4 
appellant and Lewis was recorded and was played for the jury. The following is an excerpt from Lewis' testimony:
 {¶ 8} "Q. Okay. At some point in that conversation the defendant uses the phrase, `Is he cool?' In your world, in street slang, what does `Is he cool mean?'
 {¶ 9} "A. He's wanting to know and wanting to make sure he's not the police.
 {¶ 10} "Q. Okay. And what does that indicate to you?
 {¶ 11} "A. It indicates that something shady is going to be discovered.
 {¶ 12} "Q. And did you also hear on that, and it's a little — it's pretty clear him asking that you come in the dark instead of the daytime?
 {¶ 13} "A. Right.
 {¶ 14} "Q. Was that something he insisted on?
 {¶ 15} "A. Yeah. He was real adamant about that because he didn't want no one to see the bike leaving his house.
 {¶ 16} "Q. And then following that conversation you actually participated in the transaction?
 {¶ 17} "A. Yeah.
 {¶ 18} "Q. With Detective Romano?
 {¶ 19} "A. Correct." Transcript Vol. I at 132-133.
 {¶ 20} On cross-examination, Lewis, when asked if he knew whose motorcycle it was, testified that appellant had told him that a woman who was going through a divorce had taken her husband's motorcycle so that the husband could not have the same. He further testified that he was compensated by the Sheriff's Office for participating in the agreement to help set up the buy and that he had a number of felonies on his record. *Page 5 
On redirect, Lewis testified that, during his conversations with appellant regarding the motorcycle, appellant gave him the impression that it was stolen. He further testified that it made sense that appellant was storing the motorcycle inside of his house because it was stolen. When asked, Lewis indicated that he was under no obligation to give Detective Carroll the information about the motorcycle.
 {¶ 21} Detective George Rocco Romano, Jr. of the Licking County Sheriffs Department testified that, working undercover, he was asked to purchase the motorcycle from appellant. The detective testified that he was given $400.00 to purchase the motorcycle from appellant and that he went with Floyd Lewis, the confidential informant, to appellant's house. According to the detective, appellant was worried that his neighbors might see what was taking place and did not want them to see the motorcycle go out the back door. Detective Romano further testified that appellant, who was tense, said that he wanted the motorcycle taken out of the Coshocton area and did not want stolen parts "back down there." According to the detective, it was not disputed that the motorcycle was stolen. Detective Romano further testified that he was in appellant's house roughly 20 minutes before he was able to move the motorcycle outside. The following testimony was adduced when the detective was asked what gave him the impression that the motorcycle was stolen:
 {¶ 22} "A. Mr. McCormick's [appellant's] demeanor about not allowing the neighbors see the bike going out of the back, that the police were present, that the motorcycle had been on his back porch for three months and he was kind of hoping that none of the neighbors would realize it was still there. *Page 6 
 {¶ 23} "Q. Okay. And what did you understand his reason — what did you understand his reason for waiting until it was dark out?
 {¶ 24} "A. Just that. He had mentioned that possibly one of the neighbors had a video camera set up on his residence and he did not want to be I believe his terminology was smiling on camera.
 {¶ 25} "Q. But at some point you do get him to go out and you start the transaction; is that correct?
 {¶ 26} "A. Correct, sir." Transcript Vol. I at 148.
 {¶ 27} After the audiotape of the buy was played for the jury, Detective Romano was asked what appellant meant when, during the transaction, he referred to a "hot sheet." The detective testified that a "hot sheet" is a list of stolen property. He further testified that appellant never gave him title to the motorcycle.
 {¶ 28} After the State rested, appellant moved for a directed verdict under Crim. R. 29. The motion was denied. Melody Berry, Randy Berry's ex-wife and appellant's sister, then took the stand. Melody Berry testified that the couple's marriage ended in 1996, but that the two of them were still together 99.9% of the time. According to Melody Berry, in November of 2005, she agreed to loan Randy Berry, her ex-husband, around $2,000.00 and Randy Berry agreed to use the motorcycle as collateral for the loan. She further testified that she did not get the money back and that, in order to make sure that she was repaid, she took the motorcycle to appellant's house. She testified that Randy Berry was told where the motorcycle was and that she never intended to sell the motorcycle. *Page 7 
 {¶ 29} Melody Berry also testified that when Deputy Walsh went to appellant's house and indicated that Randy Berry had reported the motorcycle stolen, she told the deputy that it was not stolen and that the motorcycle was at her brother's house and was security for a loan. When asked, she testified that she had signed Randy's name to the title.
 {¶ 30} At trial, appellant testified that his sister, Melody Berry, brought the motorcycle to his house in December of 2005 and that he spent several months cleaning it up. He further testified that he believed that he was storing the motorcycle to help his sister secure a loan from her former husband. Appellant also testified that he had contacted Randy Berry a couple of times to come pick up the motorcycle and that after Randy Berry failed to do so, he decided to get rid of the motorcycle himself . According to appellant, "Floyd [Lewis] comes to my house one day and he told me another guy would give me $400.00 for it. I told Floyd to bring the guy up here and get it out of my house." Transcript Vol. I at 211.
 {¶ 31} After the conclusion of the evidence, appellant renewed his Crim. R. 29 motion for a directed verdict. The motion was denied. At the conclusion of the evidence and the end of deliberations, the jury, on March 7, 2007, found appellant guilty of receiving stolen property. Pursuant to a Judgment Entry filed on May 2, 2007, appellant was placed on community control for a period to two (2) years under specified terms and conditions.
 {¶ 32} Appellant now raises the following assignments of error on appeal:
 {¶ 33} "I. THE COURT ERRED IN DENYING THE MOTION FOR ACQUITTAL. *Page 8 
 {¶ 34} "II. THE VERDICT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."
 I, II {¶ 35} Appellant, in his first assignment of error, argues that the trial court erred in denying his Crim. R. 29 motion for acquittal. In his second assignment of error, appellant argues that the verdict was against the manifest weight of the evidence. We disagree.
 {¶ 36} Crim. R. 29 governs motions for acquittal. Subsection (A) states the following: "The court on motion of a defendant or on its own motion, after the evidence on either side is closed, shall order the entry of a judgment of acquittal of one or more offenses charged in the indictment, information, or complaint, if the evidence is insufficient to sustain a conviction of such offense or offenses. The court may not reserve ruling on a motion for judgment of acquittal made at the close of the state's case."
 {¶ 37} The standard to be employed by a trial court in determining a Crim. R. 29 motion is set out in State v. Bridgeman (1978),55 Ohio St.2d 261, 381 N.E.2d 184, syllabus: "Pursuant to Crim. R. 29(A), a court shall not order an entry of judgment of acquittal if the evidence is such that reasonable minds can reach different conclusions as to whether each material element of a crime has been proved beyond a reasonable doubt."
 {¶ 38} On review for manifest weight, a reviewing court is to examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine "whether in resolving conflicts in the evidence, the jury clearly *Page 9 
lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v.Martin (1983), 20 Ohio App.3d 172, 175, 485 N.E.2d 717. See also,State v. Thompkins, 78 Ohio St.3d 380, 1997-Ohio-52, 678 N.E.2d 541, superseded by constitutional amendment on other grounds as stated byState v. Smith, 80 Ohio St.3d 89, 1997-Ohio-355, 684 N.E.2d 668. The granting of a new trial "should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction."Martin at 175. Because the trier of fact is in a better position to observe the witnesses' demeanor and weigh their credibility, the weight of the evidence and the credibility of the witnesses are primarily for the trier of fact. State v. DeHass (1967), 10 Ohio St.2d 230,227 N.E.2d 212, syllabus 1.
 {¶ 39} In the case sub judice, appellant was convicted of receiving stolen property in violation of R.C. 2913.51(A). Such section states as follows: "No person shall receive, retain, or dispose of property of another knowing or having reasonable cause to believe that the property has been obtained through commission of a theft offense."
 {¶ 40} In the case sub judice, appellant does not dispute that the State presented evidence as to identity, venue and the property involved. Rather, appellant contends that the State failed to produce sufficient evidence that appellant had reasonable cause to believe that the motorcycle was obtained from the commission of a theft offense. Appellant argues that there was no evidence that the motorcycle was ever, in fact, stolen or that appellant believed that it was stolen.
 {¶ 41} However, as is set forth in the facts above, testimony was adduced at trial that appellant, who was nervous during the transaction, knew that the motorcycle, which *Page 10 
appellant Randy Berry testified was taken without his permission, was on a "hot sheet", which is a list of stolen vehicles. Floyd Lewis testified at trial that appellant asked him if the purchaser of the motorcycle was a police officer and also insisted that the transaction take place when it was dark outside because he did not want anyone to see the motorcycle leaving his house. Lewis also testified that appellant let him know the motorcycle had been stolen. Moreover, Deputy Romano testified that it was undisputed that the motorcycle was stolen and also testified that appellant did not want the motorcycle removed from appellant's house until after dark.
 {¶ 42} In short, upon our review of the record, we find that, when reviewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found that appellant received, retained, or disposed of property of another (the motorcycle) knowing or having reasonable cause to believe that the property was obtained through commission of a theft offense. We further find that the jury did not lose its way so as to create a manifest miscarriage of justice in convicting appellant of receiving stolen property. While appellant notes that Melody Berry testified that the motorcycle was not stolen and that she had taken the same as collateral for a loan, and that appellant testified that he understood the motorcycle was collateral for a loan, we note that the jury, as trier of fact, was in the best position to assess credibility. Clearly, the jury did not find Melody Berry or appellant to be credible witnesses. *Page 11 
 {¶ 43} Appellant's two assignments of error are, therefore, overruled.
 {¶ 44} Accordingly, the judgment of the Coshocton County Court of Common Pleas is affirmed.
By: Edwards, J. Farmer, P.J. and Delaney, J. concur
 JUDGMENT ENTRY
For the reasons stated in our accompanying Memorandum-Opinion on file, the judgment of the Coshocton County Court of Common Pleas is affirmed. Costs assessed to appellant.
[1] The two were divorced in 1996. *Page 1